T.C. Memo. 2019-95

UNITED STATES TAX COURT

HISHAM N. ASHKOURI AND ANN C. DRAPER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17514-15.                    Filed July 30, 2019.

Ps' Federal income tax return for each of 2009, 2010, and 2011 included a Schedule C, Profit or Loss From Business, for a real estate development business P-H conducted. Each of P-H's Schedules C reported, among other expenses, payments to his wholly owned corporation (A) for marketing materials he used in pursuit of development projects. During 2010, A received payments from a client for a business plan prepared for a project in RF. During 2011, P-H's wholly owned limited liability company (LLC) sold a unit (B) in a condominium project that LLC developed.

R's notice of deficiency disallowed the deduction of all of the expenses reported on P-H's Schedules C for 2009 through 2011 and determined accuracy-related penalties under I.R.C. sec. 6662(a). By amendment to his answer, R asserted that the payments received for the business plan were includible in Ps' income and that Ps mischaracterized the gain from LLC's sale of B. On brief, R asserted that Ps also understated the amount of that gain.

**[*2]**     Held:  P-H's payments to A were bidding costs, subject to sec. 1.263A-1(e)(3)(ii)(T), Income Tax Regs., rather than marketing, selling, advertising, or distribution costs subject to sec. 1.263A-1(e)(3)(iii)(A), Income Tax Regs.

Held, further, Ps failed to establish that any of P-H's bidding costs became deductible during the years in issue.

Held, further, Ps conceded the other deductions claimed on P-H's Schedules C by failing to include in their opening brief any meaningful argument in support of those deductions.

Held, further, R failed to meet his burden of proving that P-H, rather than A, was entitled to the consideration paid for the business plan.

Held, further, because LLC held B primarily for sale to customers in the ordinary course of business, the gain recognized from the sale of B was not "section 1231 gain", as defined by I.R.C. sec. 1231(a)(3)(A).

Held, further, the issue of the amount of gain from the sale of B was not tried by the parties' consent.

Held, further, R met his burden of production establishing the appropriateness of the accuracy-related penalties he determined, and Ps failed to establish any valid defense to those penalties.


Harvey J. Cavayero, for petitioners.

Marissa J. Savit and Lyle B. Press, for respondent.

**[*3]**     MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By a notice of deficiency dated April 16, 2015, respondent determined deficiencies of $71,827, $44,809, and $68,873 in petitioners' Federal income tax for 2009, 2010, and 2011, respectively. Respondent also determined accuracy-related penalties for those years of $14,365, $8,767, and $13,775, respectively.  By amendment to his answer, respondent asserted additional deficiencies and penalties for each year as a result of income items that he claims petitioners failed to correctly report on their returns.  We must decide whether petitioners are entitled to deduct expenses reported on Schedule C, Profit or Loss From Business, in the following amounts for the taxable (calendar) years indicated:

| Expenses | 2009 | 2010 | 2011 |
|---|---|---|---|
| Other | $229,194 | $104,624 | $223,813 |
| Meals and entertainment | 49 | 1,325 | 1,001 |
| Travel | 1,801 | 50,017 | --- |
| Office | 1,775 | 5,021 | --- |

[*4] We must also decide whether petitioners' taxable income for 2010 and 2011 includes State tax refunds petitioner Mr. Ashkouri received in each of those years,[1] whether their taxable income for 2010 should be increased by $69,798 to reflect payments made by Manaff Sagdiev for a business plan related to a development project in the Russian Federation, whether gain recognized in 2011 from the sale of a unit in a condominium complex by Mr. Ashkouri's wholly owned limited liability company (LLC) was properly reported as capital gain or instead should be recharacterized as ordinary income, and whether petitioners are subject to accuracy-related penalties under section 6662(a) for the years in issue. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

FINDINGS OF FACT

During the years in issue and when they filed their petition in this case, petitioners resided in Newton Highlands, Massachusetts, 02461.

---

[1]In the amendment to his answer, respondent asserted that petitioners inappropriately excluded from their taxable income for each year in issue an income tax refund Mr. Ashkouri received from the State of Massachusetts. On brief, however, respondent abandoned his argument concerning the refund Mr. Ashkouri received in 2009.

**[*5]** <u>Mr. Ashkouri's Business Pursuits</u>

During the years in issue, Mr. Ashkouri pursued real estate development projects under the name "Hisham Ashkouri, Architects". For one of those projects, Mr. Ashkouri formed an LLC, Cold Spring Green (CSG). Mr. Ashkouri was also the sole shareholder and officer of ARCADD, Inc. (ARCADD), a domestic corporation that provided architectural and design services. ARCADD reports its income on the basis of a June 30 fiscal year.

<u>Development Projects Pursued Through Proprietorship</u>

Mr. Ashkouri hired ARCADD to assist him in his pursuit of development projects by preparing what he referred to as "marketing" materials, such as building designs, brochures, and three-dimensional drawings. Ultimately, however, Mr. Ashkouri did not end up serving as developer of any of the projects he pursued. A potential project in Libya could not go forward because of hostilities in that country. Other projects in Washington State and Utah proved unsuccessful because of a lack of financing. If any of those projects had resulted in "a real estate transaction", Mr. Ashkouri testified, "I would be having 20 percent ownership."

[*6] Payments for Business Plan for Russian Federation Project

In June and July of 2010, Mr. Sagdiev made two wire transfers of $34,899 each to an insured money market account that ARCADD held with Citibank. Mr. Sagdiev made the payments in consideration of a business plan for the development of a new city in Tatarstan, Russian Federation. The funds were wired to ARCADD's account at Mr. Ashkouri's direction.

The business plan for the Russian Federation project identifies Noorland-Ltd. as the development's "owner" and ARCADD and Hisham Ashkouri, Architects, as consultants on urban and architectural design and project management. Although Mr. Ashkouri hoped to serve as developer of the project, he provided no further work beyond the business plan after Mr. Sagdiev failed to make a required third payment.

As explained below, ARCADD reported its receipt of the June wire transfer from Mr. Sagdiev on both its books and tax records but mischaracterized the receipt. It did not report the funds as fee revenue but instead as either interest income or as a lawsuit recovery. The balance of ARCADD's insured money market account with Citibank as of June 30, 2010, as reported on ARCADD's balance sheet as of that date, matched the amount shown on a bank statement Citibank issued. The yearend balance of the Citibank account was recorded on

**[*7]** ARCADD's books as part of a larger adjusting entry, the credits of which were to interest income ($6,537), lawsuit interest income ($608,801), and lawsuit revenue ($1,544,463). ARCADD's Form 1120, U.S. Corporation Income Tax Return, for the year ended June 30, 2010, reports interest income of $615,338 ($6,537 + $608,801) and, on Schedule M-1, Reconciliation of Income (Loss) per Books With Income per Return, nontaxable damages from a negligence lawsuit of $1,530,375.[2]

ARCADD included the July 2010 wire transfer in the fees revenue it reported for both book and tax purposes of the year ended June 30, 2011. Again, the yearend balance of ARCADD's insured money market account with Citibank reported on its balance sheet matches the amount shown on Citibank's statement of account. The adjusting entry made to reflect the balance of that account on ARCADD's books included a credit to fees revenue of $34,899. And the total fees revenue reported on ARCADD's adjusted trial balance for the year ended June 30, 2011, matched the revenue of $269,502 reported on its tax return for that year.

---

[2]It appears that $14,088 of the amount recorded in the adjusting entry as lawsuit revenue was included in the $17,088 of fees revenue that ARCADD reported for both book and tax purposes for the year ended June 30, 2010. Thus, the nontaxable income reported on Schedule M-1 is $14,088 less than the $1,544,463 of lawsuit revenue recorded in the adjusting entry.

[*8] <u>Cold Spring Green</u>

Mr. Ashkouri was the sole member of CSG, which developed a condominium project at 1188 and 1192 Beacon Street, Newton, Massachusetts. In September 2011, CSG sold unit B at 1188 Beacon Street (Unit B) for $1,250,622.

CSG's sole purpose and function was to acquire, hold, develop, operate, and sell the condominium complex of which Unit B was a part. CSG funded its development activities with a $3,933,000 construction loan from Mount Washington Bank and entered into at least nine contracts with subcontractors (including ARCADD). It relied on the services of Gibson Sotheby's International Realty to market the two units at 1188 Beacon Street for sale to customers.

In an email exchange in October 2011, petitioners' accountant, Randy Rogers, asked Mr. Ashkouri about Unit B's "approximate cost basis". Mr. Ashkouri responded that he expected that the total costs for CSG's condominium development "will be about $4,566,888."

<u>Refunds of Massachusetts Income Tax</u>

During 2009, ARCADD withheld $5,232 of Massachusetts income tax from the wages it paid Mr. Ashkouri. For 2009, Mr. Ashkouri filed a Form 1, Massachusetts Resident Income Tax Return, that reported a tax of $7 and

[*9] requested a refund of $5,225 ($5,232 – $7), which Massachusetts paid him in 2010.

During 2010, ARCADD withheld $5,038 of Massachusetts income tax from Mr. Ashkouri's wages.  For 2010, Mr. Ashkouri filed a Form 1 reporting a tax of $38 and requesting a refund of $5,000 ($5,038 – $38), which Massachusetts paid him in 2011.

Petitioners' Tax Returns

2009

Petitioners filed Form 1040, U.S. Individual Income Tax Return, for 2009 reporting total tax of $112,148, including alternative minimum tax (AMT) of $29,427 reported on line 45.  Schedule A, Itemized Deductions, of petitioners' 2009 Form 1040 reports $77,548 of State and local income taxes.  A supplementary schedule shows that petitioners' deduction for State and local income taxes for 2009 includes the $5,232 of Massachusetts income tax withheld by ARCADD.

Petitioners' 2009 return includes a Schedule C for Mr. Ashkouri's proprietorship that reports total expenses of $232,819, including office expense, expenses for travel, meals, and entertainment, and "Other expenses".  The other

[*10] expenses, reported on line 27, total $229,194 and include $221,530 labeled "Architectural Services".

2010

Petitioners' 2010 Form 1040 reports wages, salaries, and tips of $250,406, taxable interest of $1,413, and dividends of $1,437. Petitioners reported adjusted gross income (AGI) of $78,533, itemized deductions of $74,356 (including State and local income taxes of $19,310[3]), and exemptions of $7,300. Because the itemized deductions and exemptions exceeded their AGI, petitioners reported no taxable income. Their reported tax of $85 consisted entirely of self-employment tax.

The 2010 Schedule C for Mr. Ashkouri's proprietorship reports total expenses of $160,987, including office expense, expenses for travel, meals, and entertainment, and "Other expenses". The other expenses, reported on line 27, total $104,624 and include $86,571 labeled "Architectural Services".

_____

[3]Petitioners' 2010 Schedule A makes no reference to a supplemental statement detailing the items included in the total of State and local income taxes reported, and the copy of petitioners' 2010 Form 1040 which the parties stipulated does not include supplemental statements.

**[*11]** <u>2011</u>

Petitioners' 2011 Form 1040 reports total tax of $1,057.  Line 10 of that form, "Taxable refunds, credits, or offsets of state and local income taxes", reports zero and refers to supplementary statements 1 and 2.  Statement 1 attached to petitioner's 2011 return reports refunds of $5,000 from Massachusetts and $610 from New York.  Statement 2, captioned "Taxable State and Local Income Tax Refunds", appears to be a standard, computer-generated form.  The first line, labeled "Net Tax Refunds From State and Local Income Tax Refunds Stmt.", reports the $5,610 of total refunds shown on Statement 1.  The second line, labeled "Less:  Refunds--No Benefit Due to AMT-Sales Tax Benefit Reduction", also reports $5,610.  That subtraction leaves no amount on the following line, "Net Refunds for Recalculation", and the last line of Statement 2 thus shows zero as "Total to Form 1040, Line 10".

The 2011 Schedule C for Mr. Ashkouri's proprietorship reports supplies expense, expenses for meals and entertainment, and "Other expenses".  The other expenses, reported on line 27a, total $223,813 and include $221,322 labeled "Payments to ARCADD * * * for Contract Services".

[*12] Petitioners' 2011 return includes Form 4797, Sales of Business Property, that reports CSG's sale of Unit B.[4] Petitioners computed the gain on the sale by offsetting CSG's $1,250,622 amount realized by a tax basis of $1,234,677, resulting in a net gain of $15,945. Because the gain from CSG's sale of Unit B was not offset by losses from other transactions reported on their Form 4797, petitioners reported the gain as capital gain on their 2011 Schedule D, Capital Gains and Losses.

Petitioners' Form 1040 for each of the years in issue includes Form 8275, Disclosure Statement, that lists some or all of the expenses reported on the Schedule C for Mr. Ashkouri's proprietorship.[5] Mr. Rogers testified that he

---

[4]Petitioners' reporting of the sale on their own return was consistent with their established practice, which the parties stipulated, of treating CSG's activities as a business of Mr. Ashkouri's.

[5]The Forms 8275 included in petitioners' 2009 and 2010 returns cover all of the expenses reported on the Schedule C for Mr. Ashkouri's proprietorship for those years. The Form 8275 included in petitioners' 2011 return covers the $221,322 reported as payments to ARCADD for contract services.

[*13] included Form 8275 in petitioners' 2010 return because he was not sure that the reported amounts were deductible and he wanted to avoid preparer penalties.[6]

The Notice of Deficiency

As noted at the outset, respondent's notice of deficiency determined deficiencies of $71,827, $44,809, and $68,873 in petitioners' Federal income tax and accuracy-related penalties of $14,365, $8,767, and $13,775 for 2009, 2010, and 2011, respectively. The notice includes Form 5278, Statement--Income Tax Changes, that lists the adjustments made in computing petitioners' deficiencies. The only noncomputational adjustments shown on the Form 5278 involve the disallowance of the deductions claimed on the Schedules C for Mr. Ashkouri's proprietorship for the years in issue. Those adjustments result in total corrected tax liabilities of $183,975, $44,094, and $69,930 for 2009, 2010, and 2011, respectively.

Determination and Approval of Accuracy-Related Penalty

The accuracy-related penalty determined in the notice of deficiency for each of the years in issue was proposed by Steven Wong, who examined petitioners'

_____

[6]Although Mr. Rogers' testimony specifically addressed only the Form 8275 filed with petitioners' 2010 return, we assume that the Forms 8275 included with petitioners' returns for 2009 and 2011 were also filed at Mr. Rogers' behest and for similar reasons.

**[\*14]** returns for those years.  The penalties were approved in writing by Lynda Diamond, Mr. Wong's acting group manager.

<u>Petitioners' Substantiation</u>

<u>2009 Meals and Entertainment</u>

To substantiate the $49 of deductible meals and entertainment expenses reported on the 2009 Schedule C for Mr. Ashkouri's proprietorship, petitioners provided respondent's counsel with credit card statements showing charges at three restaurants that total $117.  The statements provide no information about any meal other than the date, the name of the restaurant, and the amount charged.

<u>2011 Meals and Entertainment</u>

Petitioners provided similar substantiation in regard to the $1,001 of deductible meals and entertainment expenses reported on Mr. Ashkouri's 2011 Schedule C.  The charges shown on the credit card statements, however, total only $945 and, again, those statements provide no information about any meal other than the date, the name of the restaurant, and the amount charged.

<u>2009 Travel Expense</u>

To substantiate the $1,801 travel expense reported on Mr. Ashkouri's 2009 Schedule C, petitioners provided respondent's counsel with credit card statements showing charges of $250 to MedJet Assistance, $396 to Visas & Passports 2 Go,

[*15] and $1,555 to British Airways for tickets. Other than indicating that the charge from British Airways was for tickets, the credit card statements provide no information about the nature of the expenses.

### 2009 Office Expense

To substantiate the $1,775 office expense reported on Mr. Ashkouri's 2009 Schedule C, petitioners provided respondent's counsel with credit card statements showing charges at Staples that total $1,429. The credit card statements provide no information other than the vendor, date, and amount of each charge.

### Architectural or Contract Services

To substantiate the $221,322 "Contract Services" expense reported on the Schedule C for Mr. Ashkouri's proprietorship for 2011, petitioners provided respondent's counsel with a spreadsheet listing deposits that total that amount made to an account ARCADD held with Citibank. The deposits are further evidenced by bank statements and deposit slips, most of which identify Mr. Ashkouri as the depositor.

Petitioners provided similar documentation in regard to the $221,530 "Architectural Services" expense reported on Mr. Ashkouri's 2009 Schedule C, except that the deposits listed on the spreadsheet, made to an account with

[*16] Citizens Bank, total only $221,500, and the deposit slips do not identify the depositor.

For 2010, petitioners also provided a spreadsheet listing deposits along with supporting documentation, but the deposits total $181,743--far more than the $86,571 reported on Mr. Ashkouri's 2010 Schedule C as architectural services expenses. Again, the accompanying deposit slips do not identify the depositor.

None of the documentation of deposits to ARCADD's bank accounts for any of the years in issue gives any indication of the purpose of the deposits.

Discovery

Petitioners repeatedly failed to comply with respondent's requests for admissions, for the production of documents, and for interrogatories, necessitating our issuance of orders directing compliance.

In his first request for admissions, respondent sought, among other things, an admission that "Mr. Ashkouri's Schedule C architecture business did not generate any gross receipts during the 2008, 2009, 2010, 2011, or 2012 tax years." In their belated response, petitioners denied that requested admission, noting Mr. Ashkouri's receipt of loans and proceeds from the sale of units in CSG's condominium development. They also stated that Mr. Ashkouri "received

[*17] additional money for the development of a business plan for the new City of Noorland, Russian Federation."

In their response to respondent's interrogatories, petitioners advised respondent's counsel: "The Petitioner [apparently a reference to Mr. Ashkouri] received 2/3 payment on a full contract for $105,000 to complete the Business Plan for the City of Noorland which was promptly paid to ARCADD, Inc. Hisham Ashkouri completed the work at 100% and submitted the Business Plan to his client Mr. Mannaf Sagdiev of Kazan, Tatarstan."

In response to a request from respondent's counsel for statements of accounts in which Mr. Ashkouri held an interest, petitioners stated that "[t]he money transferred from the Russian Federation was deposited into an ARCADD Citibank account". They acknowledged that the deposit into an ARCADD account was contrary to what they had understood and believed during a prior meeting with respondent's counsel in September 2016.

Respondent's Amendment to His Answer

In December 2016, respondent sought leave to amend his answer. After we granted that leave, respondent amended his answer, alleging:

> [P]etitioners are liable for increased tax deficiencies (and correspondingly increased accuracy-related penalties under I.R.C. § 6662(a)) for the following three unreported income items:

[*18] (1) unreported state tax refunds received during the 2009, 2010, and 2011 tax years on account of state taxes paid during the 2005, 2006, 2009, and 2010 tax years; (2) unreported Schedule C gross receipts in the amount of $69,798 for services provided by Ashkouri for a project in the Russian Federation during the 2010 tax year, and (3) unreported Schedule C gross receipts in the amount of $15,945 for the 2011 tax year, on account of petitioners' mischaracterization of such income as capital gain.

Respondent's allegation regarding mischaracterized income relates to CSG's sale of Unit B. His answer, as amended, challenges only the character of that gain--not its amount.

Mr. Ashkouri's Testimony Concerning the Russian Federation Project

On cross-examination, respondent's counsel asked Mr. Ashkouri about his involvement in the Russian Federation project. Relevant portions of his testimony follow:

Q      And, in 2010, as compensation for your services, Mr. Sagdiev made two payments in the amount of $34,899 each?

A      That's correct.

Q      So, in 2010, you were paid a total of $69,798 for the Russian Federal project.

A      That is incorrect. I want to say that because when you say you, it means Hisham Ashkouri. You have to say ARCADD received the money. It went to ARCADD's account.

Q      So you told Mr. Sagdiev which bank account into which he should--

A    Yes.

Q    --wire the payments?

A    That's correct.

Q    And you chose to have him wire the money into the Citi Bank account in the name of ARCADD?

A    That's correct.

Q    And the two payments he made were a payment for architectural and development services that you provided to him.

A    Architectural services.  It was a business plan that we developed for him.

Q    It was you solely providing architectural services?

A    Business plan, correct.

\*        \*        \*        \*        \*        \*        \*

Q    \* \* \*  This is the proposal that you provided to--for the Russian Federation project.

A    This is not the proposal.

Q    What is it?

A    This is the actual--this is the actual report.

Q    Who prepared the report?

A    ARCADD did.

\*        \*        \*        \*        \*        \*        \*

[*20]      Q     Under Project Administration, it says Noorland, Ltd., is the owner and developer of Noorland new city project.

          So Noorland, Ltd., was the developer of the project?

      A     That is correct.

      Q     ARCADD was not the developer of the project.

      A     No. I said that--I already stated that to you. That I would like to have been the developer for the project. This was at the end, but then the guy never paid the third payment, so I would not honor the agreement anymore.

    *      *      *      *      *      *      *

      Q     So your testimony is that your Schedule C was uninvolved with the Russian project?

      A     Absolutely.

Petitioners' 2011 Amended Return

The parties stipulated that petitioners "provided respondent's counsel with fourteen binders of documents"; but the stipulation does not include those binders as exhibits, nor did petitioners seek on their own to introduce those binders at trial.

The only document petitioners introduced into evidence on their own, in addition to those which they jointly stipulated with respondent, is Form 1040X, Amended U.S. Individual Income Tax Return, for 2011. The document, which is stamped "Client Copy", bears the signatures of Messrs. Ashkouri and Rogers (as preparer) but not that of Ms. Draper. The Schedule C for Mr. Ashkouri's

**[*21]** proprietorship included in the 2011 amended return (and stamped "As Amended") is identical to the Schedule C included in the 2011 return they filed.

OPINION

I.    Introduction

A.    Burden of Proof

Rule 142(a)(1) provides:  "The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the respondent."

Section 7491(a)(1) may shift the burden of proof to the Commissioner as to factual matters generally.  That section applies, however, only if (among other things) the taxpayer complies with substantiation requirements, maintains all required records, and cooperates with the Commissioner's requests for witnesses, information, documents, meetings, and interviews.  See sec. 7491(a)(2)(A) and (B).

Petitioners make no argument that the conditions for shifting the burden of proof have been met.  Moreover, as explained below, petitioners did not establish their compliance with the substantiation requirements governing the deductions in issue.  And they did not timely comply with respondent's discovery requests.

**[\*22]** We therefore conclude that respondent has the burden of proof in regard to the three issues asserted by amendment to his answer. (In addition, as explained in part IX below, respondent has the burden of production in regard to petitioners' liability for accuracy-related penalties.) In all other respects, petitioners bear the burden of proof.

      B.     <u>Petitioners' Nonconforming Briefs and Resulting Concessions</u>

Rule 151(e) provides requirements for the form and content of briefs submitted to this Court. Briefs must begin with "a table of contents with page references, followed by a list of all citations arranged alphabetically as to cited cases and stating the pages in the brief at which cited." Rule 151(e)(1). A party's opening brief must include "[p]roposed findings of fact * * * based on the evidence, in the form of numbered statements". Rule 151(e)(3). Each numbered statement must include "references to the pages of the transcript or the exhibits or other sources relied upon to support the statement." <u>Id.</u> A brief must also include the party's "argument, which sets forth and discusses the points of law involved and any disputed questions of fact." Rule 151(e)(5).

Petitioners' opening brief fails in several respects to comply with Rule 151(e)'s requirements. It has no table of contents. It lacks a list of citations-- although that omission may be explained by the brief's failure to cite any cases and

**[\*23]** its almost complete lack of references to applicable statutory provisions.[7]

Eight numbered paragraphs follow the heading "Proposed Findings of Fact", but those proposed findings are not supported by references to evidence in the record. The balance of petitioners' opening brief consists primarily of factual statements, although they are not identified as such and, again, are not accompanied by references to the record. To the extent that their opening brief includes any arguments at all, those arguments are conclusory, undeveloped, and unsupported by references to applicable authorities.

Because of petitioners' failure to support their proposed factual findings with citations of the record,[8] we have not relied on petitioners' proposals in making our own findings. Instead, we have made our findings on the basis of the record and adopted those of respondent's proposed findings that we determined to be consistent with the record. See Van Eck v. Commissioner, T.C. Memo. 1995-

---

[7]In apparent acknowledgment of respondent's argument that Mr. Ashkouri had to capitalize the largest category of his reported Schedule C "Other expenses", petitioners invoke the capitalization provision of sec. 263A but do so only in a heading, without discussing any of that section's specific provisions or the regulations that interpret them. We found no other references in petitioners' opening brief to the statutory provisions relevant to the issues in the case.

[8]Respondent lodged a general objection to all of petitioners' proposed findings as a result of their failure to comply with Rule 151(e)(3) by including in the findings references to the transcript, exhibit, or other supporting sources in the record.

**[\*24]** 570, 1995 WL 700553, at \*3-\*4 (adopting a similar approach in a case involving a taxpayer's failure to comply with Rule 151(e)(3)).

In addition, we will treat petitioners as having conceded each issue in regard to which their opening brief advances no meaningful legal argument.[9] In past cases in which a taxpayer's brief makes no argument on an issue or includes only an undeveloped argument that fails to meet the requirements of Rule 151(e)(5), we have treated the taxpayer as having conceded that issue. E.g., Bradley v. Commissioner, 100 T.C. 367, 370 (1993); Adeyemo v. Commissioner, T.C. Memo. 2014-1, at \*28 ("The \* \* \* [taxpayers'] brief points to no specific support, from the record or elsewhere, for the proposition that they are entitled to deductions for their rental real-estate business that were disallowed on lack-of-substantiation grounds. The brief's failure to advance this issue beyond a vague

---

[9]To the extent that petitioners' reply brief advances arguments, those arguments, as well, tend to be undeveloped and conclusory. Petitioners' reply brief reproduces, verbatim, respondent's opening brief and inserts occasional responses. Even if petitioners advanced fully developed arguments in their reply brief, however, we would decline to consider them. Having conceded an issue by failing to advance a meaningful argument on that issue in their opening brief, petitioners could not withdraw that concession by belatedly including a cognizable argument in their reply brief. Cf. Considine v. Commissioner, 74 T.C. 955, 969-970 (1980) (characterizing as "untimely" and thus declining to consider an argument advanced for the first time in a reply brief).

**[*25]** assertion convinces us that the * * * [taxpayers] have waived the issue.").

We will follow the same approach in the present case.[10]

II.     Schedule C Other Expenses

    A.     Introduction

For each of the years in issue, the largest amount (by far) included in the "Other expenses" reported on the Schedule C for Mr. Ashkouri's proprietorship is the one described either as "Architectural Services" (on the Schedules C for 2009 and 2010) or "Payments to ARCADD * * * for Contract Services" (on the 2011 Schedule C). The amounts reported as payments for architectural or contract services range from 83% to 99% of the total reported other expenses.

Respondent claims that petitioners failed to substantiate any of the expenses reported on the Schedules C for Mr. Ashkouri's proprietorship for the years in issue. He makes an additional argument, however, in regard to the payments for architectural or contract services, which he contends had to be capitalized under section 263A.

---

[10]If petitioners had appeared before us pro se, we might have been more lenient in enforcing Rule 151(e), see, e.g., Veneziano v. Commissioner, T.C. Memo. 2011-160, 2011 WL 2637281, at *1; but petitioners were represented (and their briefs signed) by an attorney who, as a member of the Tax Court bar, should have been familiar with the Court's Rules.

[*26] We will thus consider Mr. Ashkouri's payments for architectural or contract services separately from our consideration of the remaining other expenses.

B.      Architectural or Contract Services

Section 263A requires the capitalization of direct and indirect costs of property produced by the taxpayer or property acquired by the taxpayer for resale. Sec. 263A(a) and (b). For purposes of section 263A, the term "produce" means to "construct, build, install, manufacture, develop, improve, create, raise, or grow." Sec. 1.263A-2(a)(1)(i), Income Tax Regs. Thus, respondent contends: "To the extent Ashkouri alleges that the expenses at issue were incurred to develop real properties for his Schedule C business, such expenses must be capitalized and are not currently deductible." Respondent adds that "there is insufficient information in the record to establish whether petitioners are entitled to any portion of the capitalized expenses during the Tax Years at Issue".

In their opening brief, petitioners respond that the deductions in issue "could not be capitalized as they were used for marketing and promotion with no real estate transaction." Although petitioners fail to cite any authority in support of that claim, they are correct that section 263A does not require the capitalization of "marketing, selling, advertising, and distribution costs." See sec. 1.263A-1(e)(3)(iii)(A), Income Tax Regs.

[*27] Another provision of the regulations, however, convinces us that the payments Mr. Ashkouri made to ARCADD for architectural or contract services are not "marketing, selling, advertising, * * * [or] distribution costs" within the meaning of section 1.263A-1(e)(3)(iii)(A), Income Tax Regs. Section 1.263A-1(e)(3)(ii)(T), Income Tax Regs., requires a taxpayer to "defer all bidding costs paid or incurred in the solicitation of a particular contract until the contract is awarded." The treatment of those deferred costs depends on whether the taxpayer receives the contract:

> If the contract is awarded to the taxpayer, the bidding costs become part of the indirect costs allocated to the subject matter of the contract. If the contract is not awarded to the taxpayer, bidding costs are deductible in the taxable year that the contract is awarded to another party, or in the taxable year that the taxpayer is notified in writing that no contract will be awarded and that the contract (or a similar or related contract) will not be rebid, or in the taxable year that the taxpayer abandons its bid or proposal, whichever occurs first. * * *

Id.

Section 263A would apply to Mr. Ashkouri's pursuit of development projects, however, only if those projects would have resulted in his acquisition of property. As noted above, that section requires the capitalization of costs of property produced by the taxpayer. In general, however, "a taxpayer is not considered to be producing property unless the taxpayer is considered an owner of

**[\*28]** the property produced under federal income tax principles." Sec. 1.263A-2(a)(1)(ii)(A), Income Tax Regs.

Mr. Ashkouri's testimony regarding the projects he pursued was not particularly detailed, but we take him as having acknowledged that, had he been awarded any of the projects, he would have acquired an ownership interest in the property being developed. He did not identify any project for which he claimed deductions in which he would not have received an ownership interest had he been awarded the contract.[11]

Thus, we accept petitioners' argument that Mr. Ashkouri was not required by section 263A to capitalize his expenses of pursuing any project that did not result in his acquiring an interest in property.[12] But petitioners' argument does not

---

[11]Sec. 263A might not apply to any costs Mr. Ashkouri incurred in pursuing the Russian Federation project. We find no evidence in the record of any relationship between Mr. Ashkouri and Noorland-Ltd., the party identified in the business plan as the development's "owner", other than their potential joint participation in that project. But the record does not establish what portion of the payments Mr. Ashkouri made to ARCADD, if any, was for the Russian Federation project. Moreover, if, as petitioners claim, ARCADD prepared the business plan and received payment therefor directly from Mr. Sagdiev, it would not have been entitled to compensation from Mr. Ashkouri for its work.

[12]Respondent observes that this Court "has specifically held that architect's fees must be capitalized under I.R.C. § 263A if I.R.C. § 263A applies." To the extent that the cases respondent cites in support of that observation involved architect's fees, however, they required the capitalization of fees paid for plans for

(continued...)

**[*29]** establish that the expenses in issue were immediately deductible. We conclude that those expenses are governed by section 1.263A-1(e)(3)(ii)(T), Income Tax Regs., and thus are not covered by the exemption for marketing costs provided by section 1.263A-1(e)(3)(iii)(A), Income Tax Regs. Section 1.263A-1(e)(3)(ii)(T), Income Tax Regs., required the deferral of those costs pending the outcome of the bidding process. And petitioners have not met their burden of proving that those initially deferred costs became deductible during any of the years in issue. Mr. Ashkouri was, for the most part, unsuccessful in his pursuit of the various projects in regard to which he claims to have paid ARCADD for marketing materials. (The payments made by Mr. Sagdiev in regard to the Russian Federation project were only for a business plan; Mr. Ashkouri was not awarded a contract to develop property in Russia.) But petitioners have not established when (if ever) the development contracts Mr. Ashkouri sought were awarded to others, when Mr. Ashkouri received written notice that no contract would be awarded, or when he abandoned his bid or proposal for each project.

---

[12](...continued)
the development of property owned by the taxpayer. See Von-Lusk v. Commissioner, 104 T.C. 207 (1995); Ohana v. Commissioner, T.C. Memo. 2014-83. Those cases thus do not establish that fees paid for architectural drawings used in the unsuccessful pursuit of development projects must also be capitalized.

**[\*30]** Even if we were to accept that the expenses in issue were not subject to deferral under section 1.263A-1(e)(3)(ii)(T), Income Tax Regs., we would still conclude that respondent properly disallowed the deductions for architectural or contract services claimed on the Schedules C for Mr. Ashkouri's proprietorship because petitioners did not adequately substantiate the expenses underlying the claimed deductions. In general, section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". When called upon by the Commissioner, however, a taxpayer must substantiate his expenses. See, e.g., Park v. Commissioner, T.C. Memo. 2012-279, at \*4; see also sec. 6001; sec. 1.6001-1(a), Income Tax Regs. To meet that burden, the taxpayer must substantiate both "the amount and purpose of the claimed deduction." Higbee v. Commissioner, 116 T.C. 438, 440 (2001). The documentation petitioners provided to substantiate the claimed deductions for architectural or contract services establishes only the making of deposits (sometimes by Mr. Ashkouri) to ARCADD's bank accounts. As respondent observes concerning that documentation, "there is nothing linking the specific deposits to a reason why they are being made (i.e. specific work that was done by ARCADD to generate the payment due, a specific invoice, bill, etc.)." And respondent is also correct that, in regard to most of the deposits, "there is no

**[\*31]** documentation in the record establishing that petitioners were the source of funds for the deposits."

The rule established in <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930), allows us to estimate the amounts of allowable deductions when there is evidence that the taxpayer incurred deductible expenditures. To do so, however, we must have some basis on which to make an estimate. <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985). We accept that Mr. Ashkouri's pursuit of development projects required the preparation of proposed designs and other materials to demonstrate to prospective clients how he and his affiliates would pursue the project if selected. But we find insufficient evidence in the record to make even a rough estimate of what the necessary materials might cost. Therefore, even if petitioners had established that the costs of any "marketing" materials for which Mr. Ashkouri paid ARCADD were deductible when paid, we would still uphold respondent's disallowance of petitioners' deduction of those costs because they have neither adequately substantiated the amounts incurred nor given us a reliable basis for estimating them.

C.   <u>Remaining "Other Expenses"</u>

In regard to the expenses other than those for architectural or contract services reported on line 27 or 27a of the Schedule C for Mr. Ashkouri's

**[*32]** proprietorship for each of the years in issue, the only argument petitioners make in their opening brief is encompassed within the summary claim that they "were entitled to claim Schedule C expenses in the amounts of $229,194, $104, 624 [sic] and $223,332 for the 2009, 2010 and 2011 tax years, respectively as was demonstrated in our exhibits."

We cannot be sure what exhibits petitioners have in mind. In their briefs, they refer repeatedly to 14 "volumes" of three-ring binders that they provided to respondent to substantiate the Schedule C deductions in issue. Respondent stipulated his receipt of those documents, but the documents themselves were not attached to the parties' stipulation. Petitioners accuse respondent of having "WITHHELD EVIDENCE", thereby "misleading * * * the Honorable Court". But respondent merely declined to stipulate the material in petitioners' volumes. Petitioners made no effort to introduce on their own those materials which respondent declined to stipulate. The only document petitioners introduced on their own is an apparently unfiled amended return for only one of the years in issue that reports Schedule C expenses for Mr. Ashkouri's proprietorship in the same amounts as the 2011 return petitioners actually filed. An amended return, whether or not filed, that reports the same deductions claimed on an originally filed return cannot serve as substantiation for those deductions.

**[*33]** In short, petitioners offer us no meaningful argument to contest respondent's claim that they have not adequately substantiated the remaining amounts (in addition to payments for architectural or contract services) reported on line 27 or 27a of the Schedule C for Mr. Ashkouri's proprietorship for each of the years in issue. Their brief cites no authority on what constitutes adequate substantiation and includes no clear references to substantiating evidence in the record. We will thus treat petitioners as having conceded that they are not entitled to deduct the remaining other expenses.

III.    Schedule C Meals and Entertainment

In regard to the expenses for meals and entertainment reported on the Schedules C for Ashkouri's proprietorship for the years in issue, petitioners claim in their opening brief: "Petitioner Ashkouri included the restaurant receipts in his submission to the Respondent's counsel and the Honorable court." They do not advise us where in the record we can find those receipts. They conclude their argument (such as it is) by complaining about respondent's questioning of the relatively small expense reported for 2009:

> Petitioner Ashkouri finds it hard to understand that the annual expense for 2009 on meals of $49 was being questioned by the Respondent, when Petitioners and their staff were working tirelessly on completing CSG work, marketing in the USA and abroad. The same should also be accounted for 2010 and 2011 where ARCADD

**[*34]** was also working on the Federal Way Projects, the Salt Lake City Project, as well as the projects in Russia and Libya. Petitioner have [sic] produced and delivered to Respondent, [sic] exhibits with 100% accurate detailed expenses.

But respondent did not disallow the claimed deductions for meals and entertainment expenses because the expenses were unreasonable in amount; he disallowed them because, he contends, petitioners did not provide adequate substantiation for them. And petitioners have given us no reason to conclude otherwise.

Again, petitioners' opening brief offers us no meaningful argument challenging respondent's disallowance of the deductions in issue. We will thus treat petitioners as having conceded that they are unable to adequately substantiate the expenses for meals and entertainment reported on the Schedules C for Mr. Ashkouri's proprietorship for the years in issue.

Even if we did not treat petitioners as having conceded their failure of substantiation and instead undertook our own search of the record for adequate substantiation, we would not find evidence sufficient to meet the applicable standard. Section 274(d) imposes heightened substantiation requirements for deductions or credits for traveling expenses, expenses for gifts, amounts with respect to "listed property", and items "with respect to an activity which is of a

[*35] type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity".

To meet those requirements, a taxpayer must

> substantiate[] by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility or property, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility or property, or receiving the gift. * * *

Id.

The evidence we find in the record documenting the expenses for meals and entertainment reported on the Schedules C for Mr. Ashkouri's proprietorship for the years in issue does not meet the standards of section 274(d). We find no documentary evidence at all of the expenses reported for 2010. And the evidence submitted in regard to the other years does not establish the business purpose served by the expenditures.

We thus conclude that respondent properly disallowed the deduction of the expenses for meals and entertainment reported on the Schedules C for Mr. Ashkouri's proprietorship for the years in issue.

**[*36]** IV.    Schedule C Travel Expenses

Regarding the deductibility of the reported travel expenses, petitioners claim to have "presented * * * part of the Discover Card expenses the vast sums of money paid for travel to Russia and Libya to the British Airways, not to forget the cost of visas, runners for obtaining the visas in Washington, DC."  Again, however, they neglect to tell us where in the record we can find the documentation they claim to have presented.  The balance of what passes for an argument on this issue in their opening brief consists of further description of Mr. Ashkouri's travel--but still with no references to evidence in the record supporting the amounts of the claimed deductions.

While those descriptions might indicate a business purpose for some of Mr. Ashkouri's trips, statements in a party's briefs are not part of the evidentiary record.  See Rule 143(c) ("[S]tatements in briefs * * * do not constitute evidence."); see also Veneziano v. Commissioner, T.C. Memo. 2011-160, 2011 WL 2637281, at *1 (disregarding testimonial statements included in a brief that could not be readily sourced to the record).  Mr. Ashkouri's opportunity to testify was at trial; he cannot supplement that testimony on brief.

Once again, because of petitioners' failure to advance a meaningful argument, we will treat them as having conceded the issue.  Moreover, as was the

**[*37]** case in regard to the meals and entertainment expenses reported on the

relevant Schedules C, we would also hold against petitioners in regard to the travel

expenses even if we did not treat them as having conceded the issue but instead

undertook our own search of the record for adequate substantiation. Traveling

expenses, like those for meals and entertainment, are subject to the heightened

substantiation requirements of section 274(d). We find no evidence in the record

to substantiate the travel expenses reported for 2010, and the evidence submitted

in regard to the 2009 travel expenses does not establish the business purpose for

the expenses.

We thus conclude that respondent properly disallowed the deductions of the

travel expenses reported on the Schedules C for Mr. Ashkouri's proprietorship for

the years in issue.

V.    Schedule C Office Expenses

In regard to the deductibility of the office expenses reported on the

Schedules C for Mr. Ashkouri's proprietorship for the years in issue, petitioners

again attempt to testify through their opening brief, advising us:

> The Office expenses claimed by the Petitioners for Years 2009 in the
> amount of $1,775 and 2010 at the amount of $5,021 were costs for
> office stationery, drawing ink for plotters, printers, printing paper for
> drawings, etc. These materials had to be bought to allow the
> Petitioner to explain his plans for these projects to the clients, staff at

**[*38]** ARCADD and to its architectural and engineering consultants * * *. ARCADD's planning and execution of the business plan for the City of Noorland required constant production and documentation with electronic media sent to Russia and back.

Again, factual assertions made by a party on brief are not part of the evidentiary record. Parties can--indeed, are required to--make proposed findings of fact, but those proposals must be grounded in the record. Petitioners' opening brief includes no references to evidence in the record to support the amount of office expenses reported or the business justification for their incurrence.

Once again, we will treat petitioners as having conceded the issue by reason of their failure to advance a meaningful argument in their opening brief challenging respondent's denial of the claimed deductions. And once again, were we instead to consider the issue on the merits and conduct our own search of the record for evidence sufficient to substantiate those deductions, our search would prove unsuccessful. The documentation petitioners submitted to support the office expense reported on the 2009 Schedule C for Mr. Ashkouri's proprietorship does not indicate the relationship between the expense and the proprietorship's business. And we find no evidence at all concerning the office expense reported for 2010. In fact, in their reply brief, petitioners admit that "Ashkouri is not sure how Mr. Rogers arrived at $5,021 expense * * * for 2010."

[*39] We thus conclude that respondent properly disallowed the deductions of the office expenses reported on the Schedules C for Mr. Ashkouri's proprietorship for 2009 and 2010.

VI.    State Tax Refunds

A.    Introduction

Taxpayers are required to include State tax refunds in their Federal taxable income only to the extent of any tax benefit they realized from their prior deduction of the State taxes in question. Section 111(a) provides: "Gross income does not include income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of tax imposed by this chapter."

In 2010, Mr. Ashkouri received a refund of $5,225 of Massachusetts income tax paid during 2009 and included in the amount of State income tax reported on Schedule A of petitioners' 2009 Form 1040. And in 2011, Mr. Ashkouri received a refund of $5,000 of Massachusetts income tax paid during 2010. The copy of petitioners' 2010 Federal return included in the record does not provide sufficient detail to determine that the $5,000 Massachusetts refunded in 2011 was included in the larger sum deducted on petitioners' 2010 Schedule A. The supplementary statements attached to petitioners' 2011 Federal return, however, support an

[*40] inference that the $5,000 refunded in 2011 was included in the amount deducted the previous year. (Those statements indicate that petitioners got no tax benefit from having deducted the amount refunded--not that the amount refunded was not deducted in the first place.) And petitioners provide us no reason to interpret the statements otherwise. Therefore, petitioners must include the amounts refunded in each of 2010 and 2011 in their taxable income for the year except to the extent that the inclusion of the refunded amount on the preceding year's Schedule A did not reduce their tax liability for the earlier year.

We see no legal or factual issue for us to decide in regard to Mr. Ashkouri's Massachusetts income tax refunds. The proper treatment of those refunds appears to be purely computational. The extent to which petitioners' Federal income tax liability was reduced by reason of the later-refunded State income tax depends on the extent to which we uphold respondent's adjustment to petitioners' taxable income for each year in which the refunded amount was reported on their Schedule A.

B.    2010

As far as we can tell, petitioners claim they received no Federal tax benefit from including on their 2009 Schedule A the Massachusetts income tax refunded to Mr. Ashkouri in 2010. As they articulate their claim: "For Tax Year 2010,

**[\*41]** RSA [Rogers, Suleski & Associates, LLC, Mr. Rogers' accounting firm] filed (0) Zero refund as their calculations of prior years of Alternative Minimum Tax '(AMT') [sic] statements 1 and 2 as attached to this Petitioner's Response showing that after calculating the AMT, the amount to be reported to the IRS in terms of State Tax Refund was (0) zero." We are not sure what statements petitioners refer to. The copy of their 2010 Federal income tax return stipulated by the parties does not include any supplementary statements. But petitioners' 2009 Form 1040 reports AMT on line 45. And State income tax is not deductible in computing the alternative minimum taxable income on which the AMT is based. Sec. 56(b)(1)(A)(ii).

Respondent acknowledges that "petitioners reported an AMT liability on their 2009 Tax Return" but adds: "[I]t is unclear whether petitioners are liable for the AMT for the 2009 tax year after taking into account adjustments made pursuant to a Court opinion in this case, and whether the AMT negates the entire tax benefit received by petitioners for their deductions claimed for state tax paid." Respondent thus allows that petitioners should be required to include in income the refund of 2009 State income tax that Mr. Ashkouri received in 2010 only "if computations so provide".

[*42] C.    2011

By contrast, respondent asserts that the proper treatment of the refund of Massachusetts income tax Mr. Ashkouri received in 2011 does not depend on the extent to which we uphold his adjustments to petitioners' 2010 taxable income and thus is not computational.  According to respondent, petitioners must "report as income * * * the state income tax refund that Ashkouri received during [the] 2011 tax year * * * since petitioners received a tax benefit for the payment of * * * [the tax that was] subsequently returned to Ashkouri and thus not actually paid."

Petitioners appear to make the same argument in regard to Mr. Ashkouri's 2011 refund as the one quoted above in regard to his 2010 refund.  Immediately after addressing the 2010 refund, they assert:  "The same was calculated for Tax Year 2011, RSA filed (0) Zero refund as their calculations of prior years of AMT statements 1 and 2 as attached to this Petitioners' Response showing that after calculating the AMT the amount to be reported to the IRS in terms of state Tax Refund was zero."  The information reported on petitioners' returns for 2010 and 2011, however, does not justify their exclusion from their 2011 taxable income of the full amount of the $5,000 refund of Massachusetts income tax Mr. Ashkouri received in 2011.

**[*43]** Statement 2 attached to petitioners' 2011 Federal return is ambiguous in regard to the specific reason for excluding from their taxable income the full $5,610 of State income tax refunds received in that year. The statement refers to two possible reasons for the exclusion: the impact of the AMT or the prospect of deducting sales tax in lieu of income tax in the year in which the refunded tax was paid. See sec. 164(b)(5)(A) (allowing a taxpayer to deduct State and local general sales tax in lieu of State and local income taxes).

On the basis of their argument on brief, however, we will treat petitioners as having conceded that they did not base their exclusion from their taxable income of Mr. Ashkouri's 2011 refund on the prospect of having been able to deduct sales taxes in lieu of income tax in 2010. As noted above, petitioners claim that the amount of the exclusion was arrived at "after calculating the AMT".

But the grounds claimed by petitioners for the exclusion do not justify it: Their 2010 Form 1040 reports no AMT on line 45.

Were we not to treat petitioners as having conceded that their exclusion from taxable income of Mr. Ashkouri's 2011 refund was not attributable to sales taxes, we would face a factual question of whether they paid a sufficient amount of sales tax in 2010 to justify their exclusion of the full $5,000 refund of State income tax Mr. Ashkouri received in 2011. The evidence before us, however,

[*44] supports an inference that petitioners did not pay a sufficient amount of sales tax in 2010 to justify that exclusion. For the availability of a sales tax deduction under section 164(b)(5)(A) to have eliminated any benefit from deducting the $5,000 of Massachusetts income tax refunded to Mr. Ashkouri in 2011, petitioners would have to have paid sales taxes of at least $16,187. In that case, if they had taken into account in computing their deduction under section 164(a) only the Massachusetts income tax not later refunded, their sales tax paid of $16,187 would have exceeded their net State income tax paid of $14,310 ($19,310 reported on 2010 Schedule A – $5,000 refunded in 2010). Deducting sales tax instead of income tax would have given them total itemized deductions of $71,233 ($74,356 total reported itemized deductions – $19,310 State and local income tax + $16,187 sales tax). The excess of their AGI over their itemized deductions would have equaled their exemptions ($78,533 reported AGI – $71,233 revised itemized deductions = $7,300 reported exemptions), leaving them with taxable income of exactly zero. For every dollar that their sales tax was less than $16,187, they would have gotten some benefit from having deducted for 2010 the $5,000 of Massachusetts income tax refunded to Mr. Ashkouri in 2011.

Respondent, who bears the burden of proof on this issue, did not introduce evidence concerning the amount of sales tax petitioners paid in 2010. (Indeed, his

[*45] briefs give no indication that he recognized the potential importance of that question.)  Nonetheless, we are willing to infer from evidence that is in the record--in particular, the amounts petitioners reported on their 2010 Federal income tax return--that they paid sales tax in 2010 of less than $14,310 (that is, the excess of the $19,310 of State income tax reported on their 2010 Schedule A over the $5,000 refund Mr. Ashkouri received from Massachusetts in 2011).  Although respondent did not ask us to make that inference, the available evidence so strongly supports it that we will make it without his invitation.  On the basis of that inference, we would conclude (even without treating petitioners as having made a concession to that effect) that the possibility of deducting sales tax instead of income tax has no bearing on the extent to which their deduction of the later-refunded amount either reduced their reported Federal income tax liability or reduces the liability they are ultimately determined to owe.

Massachusetts imposes a sales tax of 6.25%, Sales and Use Tax, Mass.gov, https://www.mass.gov/guides/ sales-and-use-tax (last visited June 10, 2019)--a rate that has been in effect since 2009, The Republican Newsroom, Mass. Sales Tax Goes Up From 5% to 6.25% on Saturday, MassLive (July 31, 2009), https://www.masslive.com/news/2009/07/mass_sales_tax_goes_up_ from_5.html (last visited June 10, 2019).  Paying $16,187 of sales tax would have required

[*46] making expenditures subject to the tax of $258,992 ($16,187 ÷ 0.0625). By contrast, the wage and investment income shown on petitioners' 2010 Federal income tax return total only $253,256. In considering the amount of sales tax petitioners might have paid in 2010, we have also consulted the sales tax calculator that the Internal Revenue Service provides on its website in compliance with a congressional mandate. See H.R. Conf. Rept. No. 108-755, at 449 (2004), 2004 U.S.C.C.A.N. 1341, 1516. The calculator estimates the sales tax paid by a taxpayer for a given taxable year on the basis of average consumption patterns State-by-State to obviate the need to maintain receipts of each purchase subject to tax. Id. On the basis of petitioners' residence, AGI, and exemptions (and without regard to large, nonrecurring purchases such as that of an automobile), the online calculator estimates that petitioners paid sales tax in 2010 of only $653. See IRS Sales Tax Deduction Calculator, https://apps.irs.gov/app/stdc/stdc.html (last visited June 10, 2019).

Although the information reported on petitioners' 2010 Federal income tax return does not justify their exclusion, for 2011, of the full amount of the $5,000 income tax refund Mr. Ashkouri received from Massachusetts in that year, it did justify their exclusion of most of that refund. The sum of the itemized deductions reported on petitioners' 2010 return and their exemption amount ($74,356 +

**[*47]** $7,300 = $81,656) exceeds their reported AGI of $78,533 by $3,123.

Therefore, reducing their itemized deductions by $5,000 would have created only $1,877 of taxable income ($5,000 – $3,123). Thus, the proper treatment of Mr. Ashkouri's 2011 refund, like that of his 2010 refund, is a matter of computation pending our resolution of the issues respondent raised for petitioners' 2010 tax year. Nonetheless, from what we have said already, we can conclude that petitioners' taxable income for 2010 will be reduced by the full $5,000 of Massachusetts income tax included in the amount reported on their 2010 Schedule A and refunded to Mr. Ashkouri in 2011. We have concluded that petitioners did not properly substantiate any of the $160,987 of expenses reported on the 2010 Schedule C for Mr. Ashkouri's proprietorship. Thus, petitioners' 2010 taxable income, after taking into account our resolution of the issues before us, will far exceed $5,000.

We thus conclude that petitioners are required to include in their 2011 taxable income the full amount of the $5,000 refund of Massachusetts income tax Mr. Ashkouri received in that year. They will be required to include Mr. Ashkouri's 2010 refund in their taxable income for that year only to the extent that the calculations prepared under Rule 155 following our issuance of this opinion demonstrate that the inclusion of the amount refunded in 2010 in the amount

[*48] reported on petitioners' 2009 Schedule A reduced their Federal income tax liability for that year.

VII. Payments for Russian Federation Project Business Plan

In the amendment to his answer, respondent alleges: "Petitioners failed to report on their 2010 Tax Return * * * gross receipts in the amount of $69,798 * * * earned by Ashkouri's Schedule C business during the 2010 tax year." The amount of the alleged omission is the sum of the two wire transfers made by Mr. Sagdiev to ARCADD's bank account in June and July 2010. Respondent contends that Mr. Ashkouri was entitled to the payments in issue and should be treated as having received the payments as income (and then, presumably, as having transferred them to ARCADD as capital contributions).

In their opening brief, petitioners address the issue concerning the payments by Mr. Sagdiev as follows: "What the Respondent is stating amounts to Ashkouri committing fraud. This thought was extremely disturbing to Petitioner Ashkouri as it was the Respondent was attempting to move him to declare income that was not his. Petitioner Ashkouri had a fiduciary responsibility towards ARCADD, Inc., its staff, its clients and Federal and State Governments." In the final portion of their brief, under the heading "Conclusions", petitioners state: "The $69,794 two payments from Russian Federation were ARCADD's and not Ashkouri's."

**[\*49]** Although petitioners fail to cite any evidence in the record in support of their claim that ARCADD, rather than Mr. Ashkouri, was entitled to the payments in issue, we will accept the claims they make in their opening brief as sufficient to avoid treating them as having conceded the issue. Instead, we will treat the issue as turning on the resolution of a factual dispute: whether ARCADD or Mr. Ashkouri was entitled to the payments made by Mr. Sagdiev. Because respondent raised the issue by amendment to his answer, he bears the burden of proof on the determinative factual question. For the reasons explained below, we conclude that he has not met that burden.

The record (including the business plan itself) makes it clear that ARCADD and "Hisham Ashkouri, Architects" were both involved in the Russian Federation project. Their joint pursuit of the project is consistent with Mr. Ashkouri's description of the respective roles of ARCADD and his proprietorship. He sought to act as developer in his individual capacity, while ARCADD provided architectural and design services. Because the business plan includes proposed plans and designs, we accept that ARCADD was involved in its preparation. The question at hand is whether ARCADD worked on the business plan as a subcontractor of Mr. Ashkouri or pursuant to a direct relationship with Mr. Sagdiev. (Conversely, to the extent that Mr. Ashkouri himself was involved in the

[*50] preparation of the business plan, he could have done so either in his own right as a proprietor or instead as an employee of ARCADD.)

Under the circumstances, we expect that Mr. Sagdiev was indifferent to the questions of contractual privity that will determine the proper U.S. Federal income tax treatment of the payments he made. And we accept that, at least setting taxes aside, Mr. Ashkouri might have had little reason to scrupulously document the legal relationship between his proprietorship and the corporation. The parties' possible indifference to legal niceties would have been a problem for petitioners if they had borne the burden of proof on the issue at hand. Instead, it is respondent who faces that problem.

Some of the evidence on which respondent relies merely establishes Mr. Ashkouri's involvement, as proprietor, in the Russian Federation project. But Mr. Ashkouri--for the most part--does not deny his involvement. He admitted that he sought to serve as the project's developer.[13] The question, again, is whether

---

[13]Respondent makes much of the fact that, when asked on cross-examination whether his "Schedule C was uninvolved in the Russian project", Mr. Ashkouri answered "absolutely". But that brief exchange is contradicted by other testimony by Mr. Ashkouri and by documentary evidence. Mr. Ashkouri's ready agreement with the assertion by respondent's counsel may have reflected understandable confusion about counsel's personification of a Federal income tax form. In other testimony, Mr. Ashkouri acknowledged his interest in serving as the project's

(continued...)

**[*51]** ARCADD or Mr. Ashkouri, as proprietor, was entitled to the consideration Mr. Sagdiev paid for the business plan. In other words, did Mr. Ashkouri direct Mr. Sagdiev to wire the funds to ARCADD's account because ARCADD was entitled to the consideration, or did Mr. Ashkouri, in directing to ARCADD payments to which he was entitled individually, in effect make capital contributions to ARCADD?

Respondent also relies on petitioners' responses to discovery requests that can be read to indicate that Mr. Ashkouri himself was entitled to the payments for the business plan. Respondent insinuates that Mr. Ashkouri changed his tune at trial to avoid being subject to tax on the payments in issue. But respondent did not seek to amend his answer to (among other things) assert an omission of Russian Federation project income until December 2016--several months after petitioners had corrected their earlier statements about the destination of the funds wired by Mr. Sagdiev. Therefore, petitioners' inconsistencies regarding the entitlement to the Russian Federation project income cannot be attributed entirely to changing tax stakes.

---

[13](...continued)
developer. And the business plan itself makes clear the involvement of Mr. Ashkouri's proprietorship in the pursuit of the Russian Federation project.

[*52] The inconsistencies in Mr. Ashkouri's trial testimony concerning the entitlement to the income from the Russian Federation project may reflect an understandable degree of casualness in differentiating between himself and his wholly owned corporation. When the questions posed to him made that distinction clear, Mr. Ashkouri consistently testified that ARCADD prepared the business plan and thus appropriately received payment for it.

Respondent also observes that ARCADD did not report the June 2010 wire transfer as fee revenue on its books or tax return for the year ended June 30, 2010. But respondent seems unaware that the evidence on which he relies establishes that ARCADD did report its receipt of the June wire transfer on both its books and tax returns, although not as fee revenue. Moreover, no such mischaracterization occurred in regard to the July 2010 wire transfer. The documentation petitioners provided to respondent shows that ARCADD included the amount of that transfer in the fee revenue it reported for both book and tax purposes for the year ended June 30, 2011.

In the face of conflicting evidence concerning the identity of the party entitled to payment for the Noorland-Ltd. business plan, we conclude that respondent has not met his burden of proving that petitioners should have included Mr. Sagdiev's payments in their taxable income for 2010. The Court found Mr.

[*53] Ashkouri to be a credible witness. When forced to distinguish between his role as proprietor, on the one hand, and his role as officer and sole shareholder of ARCADD, on the other, Mr. Ashkouri testified that ARCADD prepared the business plan. Because the preparation of the business plan required design work, Mr. Ashkouri's claim is consistent with his description of the roles of his proprietorship's and ARCADD's businesses. To the extent that some of petitioners' responses to discovery requests conflict with Mr. Ashkouri's testimony at trial, those inconsistencies may be explained either by faulty recollection-- corrected after examination of the relevant documents (and before respondent amended his answer to assert unreported income)--or, again, a certain casualness in distinguishing among the roles Mr. Ashkouri filled in his various, interrelated business ventures.

VIII. <u>Gain From Sale of 1188 Beacon Street, Unit B</u>

A. <u>Introduction</u>

Petitioners reported CSG's sale of Unit B on their 2011 Federal income tax return on the premise that the property was "used in * * * [a] trade or business".[14]

---

[14]Neither party claims that petitioners' consistent reporting of CSG's activities on their individual joint returns was incorrect. Moreover, at trial, the parties agreed that CSG was properly disregarded as an entity separate from Mr. Ashkouri, its sole member. Therefore, we assume that CSG made no election

(continued...)

[*54 ] See sec. 1231(a)(3)(A) (defining "section 1231 gain" to include "any recognized gain on the sale or exchange of property used in the trade or business").  Section 1231(a)(1) provides:  "If--(A) the section 1231 gains for any taxable year, exceed (B) the section 1231 losses for such taxable year, such gains and losses shall be treated as long-term capital gains or long-term capital losses, as the case may be."

B.    Character of Gain

In the amendment to his answer, respondent claims that "petitioners mischaracterized the nature of their gain from the sale of Unit B."  The argument he makes in support of that claim, however, is somewhat misplaced.  Respondent appears to rest his argument on the contention that Unit B is not a capital asset.  Petitioners, as we understand them, would not disagree.  As noted above, their reporting of CSG's sale of Unit B reflects the premise that the property was "used in the trade or business", so that the gain from its sale was "section 1231 gain", as defined by section 1231(a)(3)(A).  Thus, they reported the gain from CSG's sale of Unit B as long-term capital gain not by reason of section 1222(3), which defines

_____

[14](...continued)
under sec. 301.7701-3(c), Proced. & Admin. Regs., to be classified as a corporation.  See sec. 301.7701-3(b)(1)(ii), Proced. & Admin. Regs. (providing that a domestic LLC that has a single owner is disregarded as an entity separate from that owner in the absence of an election to the contrary).

[*55] "long-term capital gain" to mean recognized gain from the sale of a capital asset held for more than one year, but instead by reason of section 1231(a)(1). Petitioners' reporting therefore rests on the premise that Unit B was not a capital asset. See sec. 1221(a)(2) (excluding from the definition of "capital asset" "property * * * used in * * * [a taxpayer's] trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business").[15]

Thus, the issue in contention is not whether Unit B was a capital asset but instead whether it was property used in CSG's (and therefore Mr. Ashkouri's) business. Neither party directly addresses that question. But respondent bases his argument that Unit B was not a capital asset on the contention that CSG held the property "for sale to customers in the ordinary course of * * * [its] trade or business." If respondent's claim were correct, not only would Unit B be excluded from the definition of "capital asset", see sec. 1221(a)(1), but it would also not

---

[15]We base our understanding of petitioners' position primarily on their return because their briefs offer little, if any, additional elucidation. In their opening brief, they advise us: "The profit of $15,945 from the sale of Unit 1188B of CSG sold in 2011 was reported as zero ($0.00) as Rogers calculated the $15,945 through Schedule A-Net Operating Loss (NOL) of approximately $21,567." They conclude: "Therefore, the Petitioners were not required to carry the $15,945.00 in income from the sale of Unit 1188B in their Schedule C."

[*56] qualify as "property used in the trade or business" for purposes of section 1231, see sec. 1231(b)(1)(B).

Petitioners offer us no explanation of why Unit B qualifies as "property used in the trade or business" within the meaning of section 1231(b)(1). In fact, their briefs make no reference at all to section 1231. Because they did not challenge the proposed findings on which respondent bases his position that Unit B was "held * * * primarily for sale to customers in the ordinary course of * * * [Mr. Ashkouri's] business, we so find."[16] Cf. sec. 1221(a)(1). We thus conclude that Unit B was not "property used in the trade or business" within the meaning of section 1231(b)(1) and was excluded from the definition of capital asset by section 1221(a)(1). It follows that the gain Mr. Ashkouri recognized (through CSG) from the sale of Unit B was ordinary income and not capital gain.

---

[16]Petitioners explicitly agreed to all but one of the other proposed findings on which respondent relies. The one they did not explicitly agree to, as reflected in our Findings of Fact, relates to CSG's hiring of subcontractors, including ARCADD. Petitioners responded to that proposed finding only by observing: "Copies of contracts were provided to Respondent." Because petitioners' response does not state grounds for objecting to respondent's proposed finding, we treat them as having agreed to it. See Estate of Ballantyne v. Commissioner, T.C. Memo. 2002-160, 2002 WL 1359741, at *1 n.3, aff'd, 341 F.3d 802 (8th Cir. 2003).

**[\*57]** C.    Amount of Gain

As a general rule, this Court considers only issues raised by the parties' pleadings.  E.g., Markwardt v. Commissioner, 64 T.C. 989, 997 (1975).  Departing from that practice would frustrate the stated purpose of those pleadings, which is "to give the parties and the Court fair notice of the matters in controversy and the basis for their respective positions."  Rule 31(a).  Rule 41(b)(1), however, provides an exception to that general rule, stating:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  The Court, upon motion of any party at any time, may allow such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues, but failure to amend does not affect the result of the trial of these issues.

On brief, respondent "takes the position * * * that income from the sale of 1188, Unit B was [not only mischaracterized but] also underreported in that the basis determined by Rogers was erroneously inflated."  Respondent acknowledges that the issue of Unit B's proper basis was "not raised in the pleadings".  But he purports in his opening brief to move, under Rule 41(b), "to amend the pleadings to conform to the evidence to assert unreported Schedule C gross receipts in the amount of $410,787 for the 2011 tax year."

[*58] We disagree with respondent that the issue of Unit B's basis was tried by the parties' consent. Respondent's answer, even after amendment, raised only the question of the character of the gain, accepting that its amount was $15,945, as reported on petitioners' 2011 Form 4797 and Schedule D of Form 1040. Similarly, respondent's pretrial memorandum identifies as an issue only the character of the gain and not its amount. No mention was made during trial of the amount of the gain. Therefore, we find it unsurprising that petitioners' opening brief acknowledged no issue concerning the amount of Unit B's basis. Respondent raised that issue for the first time in his opening brief.

In support of his position on the merits, respondent relies entirely on the email exchange prompted by Mr. Rogers' request of Mr. Ashkouri for an "approximate cost basis" for Unit B. The stipulation of facts with which the parties submitted that email exchange gives no indication of the exchange's intended import. We do not take the inclusion of evidence of Mr. Ashkouri's initial estimate of Unit B's basis as consent to try the issue of whether the amount later reported on petitioners' 2011 return was overstated. If petitioners had understood that respondent sought to challenge the reported basis, they might have introduced additional evidence in support of the calculations by Mr. Rogers underlying that amount.

[*59] Accordingly, the issue of CSG's basis in Unit B (and thus the amount of gain recognized upon the sale of the property) is not properly before us, and we decline to consider it.

## IX.    Accuracy-Related Penalties

Section 6662(a) and (b)(2) provides an accuracy-related penalty of 20% on the portion of an underpayment of tax attributable to "[a]ny substantial understatement of income tax."  Section 6662(d)(2)(A) defines the term "understatement" as the excess of the tax required to be shown on the return over the amount shown on the return as filed.  In the case of an individual, an understatement of tax is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  An understatement is reduced, however, by the portion attributable to the treatment of an item for which the taxpayer had "substantial authority" or, in the case of items adequately disclosed, a "reasonable basis".  Sec. 6662(d)(2)(B).  A taxpayer's position has substantial authority if the weight of the authorities in support of that position is substantial in relation to the weight of any contrary authorities.  See sec. 1.6662-4(d)(3), Income Tax Regs.  Disclosure is adequate if it includes "the relevant facts affecting the item's tax treatment".  Sec. 6662(d)(2)(B)(ii)(I).  Subject to exceptions provided in an annual revenue procedure, disclosure must be

**[*60]** made on Form 8275 or, in the case of positions contrary to a regulation,

Form 8275-R, Regulation Disclosure Statement.  Sec. 1.6662-4(f)(1) and (2),

Income Tax Regs.  The "reasonable basis" standard is "a relatively high standard

of tax reporting" that generally requires a position to be "reasonably based" on

relevant authorities.  See sec. 1.6662-3(b)(3), Income Tax Regs.

Section 6664(c)(1) provides an exception to the imposition of the section

6662(a) accuracy-related penalty if it is shown that there was reasonable cause for

the underpayment and the taxpayer acted in good faith.  As a general rule, "[t]he

determination of whether a taxpayer acted with reasonable cause and in good faith

is made on a case-by-case basis, taking into account all pertinent facts and

circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.  In making that

determination, "the most important factor" is usually "the extent of the taxpayer's

effort to assess the taxpayer's proper tax liability."  Id.  Reliance on the advice of a

professional tax adviser may constitute reasonable cause and good faith "if, under

all the circumstances, such reliance was reasonable and the taxpayer acted in good

faith."  Id.  As we observed in Neonatology Assocs., P.A. v. Commissioner, 115

T.C. 43, 100 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002), however, "[t]he mere fact

that a certified public accountant has prepared a tax return does not mean that he

or she has opined on any or all of the items reported therein."

[*61] The Commissioner bears the burden of production with respect to penalties. See sec. 7491(c). To meet that burden, he must establish the appropriateness of imposing the penalty either through the production of evidence or reliance on concessions by the taxpayer. Higbee v. Commissioner, 116 T.C. at 446; Oria v. Commissioner, T.C. Memo. 2007-226, 2007 WL 2318367, at *4. The Commissioner's burden of production under section 7491(c) includes establishing compliance with the requirement of section 6751(b) that the "initial determination" to assess a penalty be "personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). Once the Commissioner carries his burden of production, taxpayers bear the burden of proving that they are entitled to relief under section 6664(c)(1) or on the basis of substantial authority or adequate disclosure. See Higbee v. Commissioner, 116 T.C. at 446.

Respondent has established that, without regard to section 6662(d)(2)(B), petitioners substantially understated their income tax for 2009. For the reasons explained above, we are upholding all of the adjustments respondent made to petitioners' 2009 taxable income in the notice of deficiency. And, in regard to that

[*62] year, respondent no longer asserts any further adjustments.[17]  Therefore, the amount of tax petitioners were required to show on their 2009 Federal income tax return is the "total corrected tax liability" of $183,975 shown for 2009 on the Form 5278 attached to the notice of deficiency.  Petitioners' 2009 return reported a total tax of $112,148, resulting in a potential understatement of $71,827 ($183,975 – $112,148).  That understatement would be "substantial", within the meaning of section 6662(d)(1)(A), because it exceeds 10% of the tax required to be shown on their 2009 return ($18,398, which, in turn, is greater than $5,000).

Respondent has also established that, again without regard to section 6662(d)(2)(B), petitioners substantially understated their income tax for 2010 and 2011.  The precise amounts of petitioners' deficiencies for 2010 and 2011 as a result of our disposition of the issues addressed above have yet to be determined.  See Rule 155.  Nonetheless, because we are upholding all of the adjustments respondent made in the notice of deficiency for each of 2010 and 2011, the amount of tax required to be shown on their returns for those years will at least equal the "total corrected tax liability" for the year shown on the Form 5278

---

[17]As explained above, see supra note 1, although respondent asserted by amendment to his answer that petitioners omitted from their 2009 taxable income a State income tax refund received in that year, he abandoned that claim on brief.

[*63] attached to the notice of deficiency.[18]  The Form 5278 shows a total

corrected tax liability for 2010 of $44,094, which is $44,009 greater than the $85

of total tax shown on petitioners' 2010 return.  Because $44,009 is greater than

$5,000 (which, in turn, exceeds 10% of the minimum amount of tax petitioners

were required to show on their 2010 return), petitioners will have a substantial

understatement for 2010 as well unless they establish grounds for reduction of that

understatement under section 6662(d)(2)(B).  The Form 5278 shows a total

corrected tax liability for 2011 of $69,930, which is $68,873 greater than the

$1,057 of total tax shown on petitioners' 2011 return.  Because $68,873 is greater

than 10% of the minimum amount of tax required to be shown on petitioners' 2011

return (which, in turn, exceeds $5,000), petitioners will have a substantial

understatement for 2011--again, unless they can establish grounds for reduction of

that understatement under section 6662(d)(2)(B).  Therefore, respondent has

---

[18]The total amount of tax petitioners were required to report on their 2011 return will exceed the total corrected tax liability shown on the Form 5278 by reason of our conclusions that (1) petitioners were required to include in their 2011 taxable income the $5,000 refund of Massachusetts income tax Mr. Ashkouri received in that year and (2) the gain Mr. Ashkouri recognized through CSG from the sale of Unit B was ordinary income and not capital gain.  The total amount of tax petitioners were required to report on their 2010 return will exceed the total corrected tax liability shown on the Form 5278 if the parties' Rule 155 computations demonstrate that petitioners are required to include in their taxable income for that year some or all of the refund of Massachusetts income tax that Mr. Ashkouri received in that year.

**[*64]** satisfied his burden of production in regard to the substantial understatement penalties. Respondent has also satisfied his burden of production with regard to the supervisory approval requirement of section 6751(b).

Petitioners have not established that they are entitled to relief from the accuracy-related penalties respondent determined. They make no claim under section 6662(d)(2)(B) that they had either substantial authority or even a reasonable basis for the treatment on their returns of the items subject to the adjustments we have upheld. (Thus, the disclosure statement attached to their return for each of the years in issue does not reduce their understatement for the year.) Their opening brief does not address their liability for accuracy-related penalties at all. In their reply brief, they assert that they "succeeded in establishing defense to their case in Court", without articulating the basis of that defense. They suggest, without specific reference to section 6664(c)(1), that they had reasonable cause for their underpayments of tax and acted in good faith because of their reliance on their return preparer. They claim to have "relied and trusted Mr. Rogers and to this day believe in his honesty and integrity." But petitioners refer us to no evidence in the record of specific advice Mr. Rogers gave them. Indeed, we surmise from the disclosure statements that Mr. Rogers included in their

**[\*65]** returns that he warned petitioners of his doubts concerning the deductibility of the largest of the Schedule C expenses in issue.

For the reasons explained above, we conclude that petitioners are subject to accuracy-related penalties under section 6662(a) for the years in issue.

<u>Decision will be entered</u>

<u>under Rule 155</u>.